Filed 5/12/14  In re A.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.H. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E059521 |
| Plaintiff and Respondent, | (Super.Ct.Nos. J240540 & J240541) |
| v. | O P I N I O N |
| A.H. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant Mother, A.H.

Toni Taylor Buck, under appointment by the Court of Appeal, for Defendant and Appellant Father, A.H.

1

Jean-Rene Basle, County Counsel, and Danielle E. Wuchenich, Deputy County Counsel, for Plaintiff and Respondent.

## I.  INTRODUCTION

The parents of two boys born in May 2008 (A1) and September 2010 (A2) appeal the August 22, 2013, orders terminating parental rights and selecting adoption as the boys' permanent plan.  (Welf. & Inst. Code, § 366.26.)[1]  Defendant and appellant, A.H. (Mother), claims the court erred in summarily denying her petition for further reunification services and liberalized visitation.  (§ 388.)  Defendant and appellant, A.H. (Father), claims insufficient evidence supports the court's finding that the boys were likely to be adopted (§ 366.26, subd. (c)(1)), and Mother joins this claim without additional argument.  Finally, both parents claim the court abused its discretion in finding the parental benefit exception to adoption did not apply.  (§ 366.26, subd. (c)(1)(B)(i).) We find each of these claims without merit and affirm.

## II.  FACTS AND PROCEDURAL HISTORY

A. *Background*

The boys were taken into protective custody in September 2011, when A1 was three years old and A2 was 11 months old.  The parents were arrested and briefly incarcerated for child endangerment for keeping the boys in a filthy home.  At that time,

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Father was a sergeant in the United States Marine Corps, and the family was living in base housing in Twentynine Palms.

Plaintiff and respondent, San Bernardino County Children and Family Services (CFS), found the family home in base housing in "very bad condition." Grime, clothing, trash, and dirty diapers with feces were found "all over" the floors; feces were found on the crib, on the toddler mattress, and ground into the floor in A1's room, and an open diaper with feces was found under a tent in A1's room. The bathroom toilets were "brown and not accessible" because there was so much trash and clothing on the floors; there was rotten food in the refrigerator; and cigarette butts "by the thousands" in the garage. Six months earlier, the marine base housing authority cited the parents for "dirty home issues."

When asked why the family home was in such a state, Mother said she had been diagnosed with postpartum depression after A2 was born, but both parents believed she had greater mental health concerns: she was often anxious, was easily overwhelmed, and had had suicidal thoughts. A2 was briefly hospitalized after he was born, and according to Father that set Mother "over the edge" with anxiety. Father worked long hours and was too exhausted and stressed to keep up with the housework. The boys were of adequate weight and nutrition and appeared to be developmentally on target.

In November 2011, CFS recommended returning the boys to the parents under a family maintenance plan. The family home was being kept clean; Mother had made "significant progress" in therapy; her energy level had improved; and her therapist

3

believed she was capable of caring for the boys in the family home. The boys were always happy to see the parents and visits had gone "really well." At a November 4 jurisdictional/dispositional hearing, the court found general neglect allegations true, declared the boys dependents, approved a family maintenance plan, and authorized CFS to dismiss the case by approval packet.

In April 2012, the parents had successfully completed their family maintenance plan, including parenting classes, and CFS recommended dismissing the dependency proceedings. The parents had "taken good care" of the boys and had "shown stability both in their relationship and the[ir] relationship with their children." They had moved out of base housing and were living in a rental home. (CFS later reported the parents were "thrown out" of base housing in February 2012 for keeping an unsanitary home.)

By April 30, 2012, matters took a turn for the worse. Mother was filing for divorce because Father had "cheated on her" during a trip to his home state of Missouri and had "spit in her face." Mother had no means of support for the boys, and she and Father were to appear in court on May 23 regarding their child endangerment charges from September 2011. Father claimed he and Mother had a fight and Mother hit him. Father said he had wanted a divorce for two years because he and Mother had a "personality conflict" and no longer got along.

In March 2012, Father's gunnery sergeant "made the call" to remove Father from the family's rental home in Twentynine Palms, and Father moved into the barracks on the marine base. Father was placed under a 30-day Marine Corps protective order, and his

4

gunnery sergeant began supervising his weekly, two-hour visits with the boys. The parents agreed to undergo couples counseling at the base beginning on May 1. In light of these developments, CFS asked the court to extend the parents' family maintenances services for six additional months. On May 3, the court did so and set a further review hearing in November.

Then, on May 18, 2012, CFS filed supplemental petitions (§ 387), alleging the boys were at risk because the family rental home, where only Mother was living with the boys, was in very poor condition, with "urine and feces on [the] floor; grime, dirt, trash and clothes on every inch of [the] floor, etc." The petitions also alleged that, on May 15, Mother left the boys alone with a 22-month-old girl she was babysitting, and when Mother returned she found the girl had ingested her psychotropic medication and was convulsing. The girl was airlifted to a hospital and was in a coma. The petitions further alleged that Mother had a substance abuse problem as indicated by large amounts of alcohol in her refrigerator, and the parents had engaged in domestic disputes in the presence of the boys.

According to Father, Mother was "hooked" on "sexting" and spent many hours on the computer. Mother told CFS she had just got a new puppy she should not be faulted because the puppy was not potty-trained. Mother also said A1 had been having "severe behavioral issues" since Father moved out of the family's rental home; A1 went around the home "throwing things," and it was difficult for her to keep up. Mother had no education and no means of support; she was entirely dependent upon support from

5

Father.  Mother moved out of the home and in with friends on May 17; Father moved back in, and the boys were ordered detained with Father.  Father had "full support" from the Marine Corps and his coworkers helped him clean the home.

In a June 2012 jurisdictional/dispositional report, CFS expressed concern about Mother's "lack of understanding" of an appropriate level of sanitation for herself and the boys, despite repeated intervention on the issue.  Mother had also given inconsistent explanations for having so much alcohol in her home.  The parents of the 22-month-old girl, who had since recovered after ingesting Mother's medication, were pressing charges against Mother.  Mother was not accepting responsibility, and blamed the girl and the girl's mother for the incident.

In June 2012, the parents were no longer trying to reconcile and had moved on to other relationships.  The child endangerment charges from September 2011 were still pending against both of them.  Father admitted he had been verbally abusive to Mother and was attending domestic violence classes and therapy.  During a June 25 mediation, the parents admitted the allegations of the section 387 petitions.  The boys were ordered removed from Mother's care and placed with Father, with twice-weekly, two-hour visits for Mother, supervised by CFS.  In August 2012, Mother was arrested for child endangerment based on the May 17 incident with the 22-month-old girl, and was incarcerated until September 28 when she was released on 36 months' supervised probation.

Then, on October 2, 2012, CFS filed further supplemental petitions for the boys (§ 387), this time alleging Father had failed to keep the family home in a fit and sanitary condition, placing the boys at risk. Father had also failed to secure adequate licensed day care for the boys, and the boys were often dirty and not properly clothed. According to the Family Advocacy Center at the marine base, Father had "ample access" to day care services on a sliding scale but had not availed himself of the services. Father had also made insufficient progress in his domestic violence class to warrant a certificate of completion. And Father was allowing his mother to care for the boys, even though he and Mother had a restraining order against the grandmother in 2011.

On August 27, 2012, the social worker went to the rental home where Father, the grandmother, and the boys were living, and found the boys "running around barefoot with just a diaper on." The home had a foul smell, the carpet was "filthy," and the grandmother was argumentative and angry. There were numerous feces droppings on the floor of A1's bedroom. The grandmother told the social worker to get the vacuum cleaner fixed because it was broken. When the social worker returned to the home on September 11, there were numerous flies in the home, and A1, whom Father was still attempting to potty train, had spilled a receptacle full of urine on his bedroom floor. Father and the grandmother continued to claim the dark marks on the carpet were "chocolate."

On September 28, the social worker again returned to the home. This time, Father smelled of alcohol, his room was unkempt and filthy, empty alcohol bottles were found

on the ground in the backyard, and "hundreds of cigarette butts" were strewn in the garage, within reach of the boys. As before, the boys were wearing only diapers or underpants, and A1 had severe ant bite marks on his arm and torso. Father had not taken A1 to the Inland Regional Center for an evaluation, even though the Public Health Nurse had told Father the evaluation was necessary because A1 was testing "below average in some areas."

The social worker obtained a detention warrant, and with the assistance of law enforcement, removed the boys from Father's home on September 28, 2012, and placed them in foster care. The reasons for the removal included continued unsanitary conditions in the home, inappropriate care for the boys, and Father's failure to follow through with services. On September 28, a second felony child endangerment charge was filed against Father. The boys were ordered detained and placed in the temporary custody of CFS on October 3.

On October 5, 2012, the boys' foster parent issued a seven-day removal notice due to A1's behavioral problems, which CFS believed resulted from the inadequate care he had received at home. A1 had problems "in the areas of potty training and eating, as well as comprehension," the foster parents believed he was a special needs child. A1 defecated and urinated in his clothes, sometimes several times a day, devoured his food, and showed other signs of having been emotionally and/or physically abused. Al would punch his teddy bear in the face, slam the bear on the bed, and poke its eyes. He talked to the foster parents about "killing people" and would repeatedly chant "[A1] is DEAD!"

8

By October 18, the marine base Family Advocacy Program considered Father a "treatment failure" and would not offer him further services. Father's October visits with the boys were not positive. Father was cold to the boys; he did not greet them or say good-bye; he did not attempt to discipline them; but he appeared to want to control them; he was unkind to the Mother and said things to upset to her; and he exhibited a lot of anger toward the social workers. Father had a criminal history and a history of substance abuse as a teenager. Mother was appropriate with the boys during visits but still suffered from mental health issues.

On October 31, the parents reconciled and began living together again. But by that time, CFS rated the parents' prognosis for reunification as "poor" because they had not made the boys' safety or care a priority, and the boys had continually been exposed to poor care and unsafe, unsanitary conditions in the home. According to CFS, the parents were "in denial," minimized the extent of the problems they faced, and had failed to avail themselves of services.

At a November 26, 2012, jurisdictional/dispositional hearing on the further supplemental petitions, the court ordered further reunification services for each parent and continued their visits with the boys. But only four months later, at the 18-month review hearing on March 28, 2013, the court terminated each parent's reunification services.

In March 2013, the parents were still keeping "a dirty and unsanitary home." They had been "hostile, uncooperative, [and] evasive" with the social worker, and they

9

displayed the same attitude toward the public health nurse, the social service aid, and the minors' attorney. Several service providers also reported Mother was "uncooperative[,] nasty and hostile." The social worker believed the parents had not benefited from their services.

Father only began participating in services on January 9, 2013, after months of delays. He attended individual therapy, couples counseling, and domestic violence counseling. The marine base had diagnosed him with "Depressive Disorder Not Otherwise Specified and Narcissistic and Antisocial personality traits." He claimed his child endangerment charges from September 2011 and 2012 had been "closed."

Mother had attended parenting and domestic violence classes. She was required to serve 36 months of supervised probation as a condition of dismissing the child endangerment charges against her. She still showed "no remorse" for endangering the 22-month-old girl in May 2012.

On May 21, 2013, the court suspended the visitation, finding it detrimental because the boys "revert[ed] to prior behaviors" and "act[ed] out negatively" following visits. A1 would hit A2 and other foster children, would poop and smear his feces, lie frequently, and pick his lips until they were sore and bleeding. Also, Father was "loud" and "rough" during visits, which would startle the boys, and he would spend most of his time with A1 while Mother spent most of her time with A2.

Meanwhile, the boys' second foster mother, with whom the boys had lived since October 2012, had become exasperated with the boys and said she was "done" and

10

"cannot do this . . . anymore." She described A2 as rebellious and emotional, and stated A1 "always has toilet problems." A1 "poop[ed] and smear[ed] feces frequently and lie[d] frequently as well."

CFS filed a section 366.26 report on July 12, 2013. The boys were placed with a prospective adoptive family on June 5, following a 10 to 14-day visit with the family in late May. A1 was five years old and A2 was two years old. The prospective adoptive father described A2 as having a "very sweet personality and countenance." A2 appeared to be developmentally on track, though he was a little "clumsy" and was to be fully assessed for developmental functioning. A2 "whine[d] about everything that [did] not go his way," but the prospective adoptive parents were working on this issue.

By July 12, A1 was having difficulty adjusting to his new home, but he was making progress. He had yet to attend school, but by mid-July he had learned all of the letters of the alphabet and their sounds, and was learning numbers and counting skills. When he first arrived in the home, he only knew 10 letters and none of their sounds. The prospective adoptive parents were closely monitoring A1 because once, when he was left unattended, he hit A2 and another young child in the home. No further hitting incidents had occurred by July 12, however.

A1 was initially timid, aloof, and had difficulty understanding social cues. His most difficult problem was his ongoing enuresis and encopresis. Between June 5 and July 12, 2013, he urinated and/or defecated in his clothes almost daily, particularly when he was asked to do something he did not want to do, and he had gone no longer than five

11

days without soiling himself. The prospective adoptive parents were hopeful the problem would be resolved with therapeutic support and stability in the home.

Kiti Freier Randall , Ph.D, PSY, assessed A1 in March 2008. She did not believe A1 had autism or attention-deficit/hyperactivity disorder (ADHD); rather, he "presented with a need for vestibular movement which appeared as ADHD and anxious-like behaviors, stemming from hypervigilance related to his trauma history." She recommended that A1 be provided "an environment rich with opportunities to enhance his vocabulary and increase his attention, attachment and social skills."

After living with their prospective adoptive family for only a few weeks, the boys were growing in their trust and attachment to the prospective adoptive family. A1's adjustment had been more difficult, but he was improving.

B. *Mother's Section 388 Petition and the Section 366.26 Hearing*

The section 366.26 hearing was held on August 22, 2013. Both parents appeared at the hearing. They had separated again and were no longer living together.[2] On August 20, Mother filed a section 388 petition seeking further services and unsupervised, extended visitation. On August 22, CFS filed an interim review report responding to the petition and recommending adoption for the boys.

---

[2] On August 18, 2013, the social worker went to the parents' apartment and found it had been vacated. Neighbors told Mother's probation officer that the parents moved out on August 16 and left no forwarding address. Father called CFS on August 18 and 19, advising he had moved to Missouri but was returning for the section 366.26 hearing. Mother's probation officer was planning to file a warrant on August 23 because Mother had not apprised him of her whereabouts. Mother's section 388 petition indicated no known address for Mother.

Before proceeding with the section 366.26 hearing, the court considered whether Mother's petition made a prima facie showing of changed circumstances or new evidence. (§ 388.) Mother's counsel argued that the documents attached to the petition showed Mother had participated in numerous services, was making substantial progress, was currently seeing a therapist, and had a good support system. The visitation logs also showed Mother's visits with the boys had been positive, not detrimental. In fact, counsel argued that suspending Mother's visits had been detrimental to the boys.

Minors' counsel asked the court to deny the petition because it did not make the necessary prima facie showing. Most of the documents attached to the petition predated the March 28 order terminating services and the June 5 order suspending visitation. Mother completed a parenting class on May 30, but that did not show changed circumstances because she had taken the same class before. The evidence in support of the petition could have been presented to the court on June 5, but was not. And contrary to indications by Mother's therapist, there was no evidence that A1's behavioral problems stemmed from his inability to visit Mother.

County counsel joined these arguments, and pointed out that Mother's therapist had only seen her for two sessions and had never met the boys. Because the therapist had only seen Mother twice and had never met the boys, the court found the therapist's opinion that the boys were bonded to Mother "[s]elf-serving" and "ridiculous." The court found there was "really nothing" to show Mother had made any progress since March 28, when her services were terminated, and both parents had "made a mess of their

13

reunification plans." The court found the petition did not make a prima facie showing of changed circumstances or new evidence, and granting the petition would not serve the best interests of the boys.

Proceeding to the section 366.26 hearing, the court first admitted the July 12 section 366.26 report and the August 22 interim review report into evidence. The court later admitted the visitation logs into evidence, pursuant to Mother's request and eventually took judicial notice of its entire file.[3] The parents and two social workers testified.

Father testified first and objected to placing the boys for adoption. He visited the boys twice weekly for two hours from September 2012 until visitation was suspended on June 5. He left the military and moved to Missouri on June 14, 2013. He agreed with notations in the visitation log indicating his visits were positive; claimed the boys were excited to see him and Mother; showed affection toward them; and were unhappy to leave when the visits ended. The boys did not misbehave around the parents. They called Father "[d]addy" and looked to him as a father figure. A2 had difficulty with potty training while in Father's care, but he was making progress until his removal in September 2012.

Mother's counsel then called social worker Mary Bushong, the concurrent plan worker who prepared the section 366.26 report. In her opinion, the boys were adoptable

---

[3] The entire file included all of the documents deemed part of the record on appeal by this court's February 28, 2014, and October 24, 2013, orders granting Mother's and Father's respective motions to augment the record.

14

and the benefits they would realize from adoption outweighed the benefits they would realize from a relationship with the parents.  They needed a stable home, and the prospective adoptive parents were willing to give them one.  The boys' previous foster parents reported that A1's enuresis and encopresis increased following parental visits.

Bushong observed only a single visit; did not supervise any visits; and the notations in the visitation log were made by the person who supervised the visits.  According to the visitation log, no enuresis or encopresis occurred *during* A1's visits with the parents, and neither child "severely acted out" during the visits.  The parents were able to control the boys during visits.

Bushong testified A1 had "significant" attachment issues, but they could be "work[ed] through" in a "solid, stable home," and he was on a waiting list for therapy.  All dependent children "have some degree of attachment concerns" due to the stress and trauma they've experienced.  Enuresis and encopresis were common in children with attachment disorders or "power and control issues."

Bushong was not concerned the boys would become "legal orphans" or fail to be adopted due to A1's behavioral issues.  Since the boys had been with their prospective adoptive parents, A1's behavior had improved; he had not pooped in his pants since two weeks before August 20, and his enuresis had "lessoned considerably."

Social worker Eileen Lion, was assigned to the case in November 2011.  She began looking for a concurrent planning home for the boys after the parents' services were terminated in March 2013.  The boys' prospective adoptive home was their third

15

placement since October 2012. They spent 20 days in their first foster home and were removed due to A1's behavioral problems. The court took judicial notice of its entire file.

Finally, Mother testified she had good visits with the boys; they were bonded to her, showed her affection, and told her they loved her. She believed the boys were better off when they were living with her and Father because they behaved better. Mother was concerned that A1 would not be adopted due to his behavioral problems.

At the conclusion of the hearing, Father's counsel argued against adoption and in favor of applying the parental benefit exception. Father occupied a parental role in the boys' lives; he was not just a friendly visitor during visits. Counsel asked the court to consider the nature, quality, regularity, and frequency of Father's visits. Mother's counsel argued there was no clear and convincing evidence the boys were adoptable, and it was CFS's burden to meet that standard. Additionally, the parental benefit exception applied based on Mother's regular visits and positive, parental relationships with the boys.

Minors' counsel argued that clear and convincing evidence showed the boys were adoptable. A2 had no behavioral problems, and A1's enuresis and encopresis were not medical issues; they were behavioral problems that would be resolved in a stable home environment. Finally, the boys would benefit more from adoption than continuing a relationship with the parents. County counsel joined these arguments and emphasized

16

that the parents had failed to accept responsibility for A1's behavioral problems.  This was not a "close case"; the boys were young and adoptable.

After hearing the arguments of counsel, the court agreed the parents had maintained regular visits and contact with the boys, but pointed out that even though the visits were positive "by a casual observer," the boys acted out severely following the visits.  Accordingly, the court indicated the boys did not have a positive bond with the parents.  The court also noted that both parents believed they were "very good parents," "[t]he house was fine," and they had done nothing wrong, but neither parent acknowledged the severe neglect the boys suffered while in their care.  The parents did not engage the boys in basic hygiene, including potty training, baths, and clean clothes, or provide them with plentiful food.  The court found clear and convincing evidence that the boys were adoptable, and they would not benefit *at all* by continuing a relationship with the parents.  Accordingly, the court terminated parental rights and chose adoption as the boys' permanent plan.  The parents timely appealed.

## III.  DISCUSSION

A. *Mother's Section 388 Petition Was Properly Denied Without a Full Hearing*

Mother claims the court erred in summarily denying her section 388 petition for further services and liberalized, extended visitation.  We disagree there was any error.

### 1.  Applicable Law

Section 388 states, in pertinent part:  "(a)(1)  Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of

17

change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made . . . .  [¶] . . . [¶] (d) If it appears that the best interests of the child . . . *may* be promoted by the proposed change of order, . . . the court *shall order that a hearing be held . . . .*"  (Italics added.)

A section 388 petition must state a prima facie case in order to trigger the right to proceed by way of a full evidentiary hearing.  (*In re Edward H.* (1996) 43 Cal.App.4th 584, 592.)  That is, the petition must make a prima facie showing of facts sufficient to sustain a favorable decision if the facts are credited.  (*Id.* at p. 593; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 310.)  The court must liberally construe the petition in favor of its sufficiency (see Cal. Rules of Court, rule 5.570(a); *In re Angel B.* (2002) 97 Cal.App.4th 454, 461), which is to say the petition must be "liberally construed in favor of granting a hearing to consider the parent's request.  [Citations.]"  (*In re Marilyn H., supra,* at pp. 309-310; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413-1414.)

"'There are two parts to the prima facie showing:  The parent must demonstrate (1) a genuine change of circumstances or new evidence, and that (2) revoking the previous order would be in the best interests of the children.  [Citation.]'"  (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1079 [Fourth Dist., Div. Two].)  "[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition."  (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; *In re C.J.W., supra,* at p. 1079.)

18

We review a juvenile court's summary denial of a section 388 petition for an abuse of discretion. (*In re Marcos G.* (2010) 182 Cal.App.4th 369, 382.) If the liberally construed allegations do not make prima facie showings of changed circumstances or new evidence and best interests, the summary denial of the petition does not violate the petitioner's due process rights. (*In re Angel B., supra,* 97 Cal.App.4th at pp. 460-461.)

2. Analysis

Mother argues "[i]t is unfathomable that the juvenile court refused to hold an evidentiary hearing" on her petition "in light of the plethora of services" she completed. Not so. The petition did not make a prima facie showing of changed circumstances, new evidence, or best interests.

First, and as the court recognized at the August 22 hearing on whether Mother's petition made the required prima facie showings, most of the documents attached to the petition showed Mother participated in or completed services *before* her services were terminated on March 28, 2013. The court said: "I'm looking at a lot of old certificates. I haven't seen any change." Further, nothing in the petition competently indicated that Mother's circumstances had changed based on any services she participated in *after* her services were terminated on March 28, *or* after June 5, when both parents' visits were suspended pending the section 366.26 hearing.

In particular, Mother's August 20, 2013, letter from her therapist, Deren Mikels, LCSW, did not make a prima facie showing of changed circumstances. The therapist concluded there had been changed circumstances and that reinstating services and

19

visitation for Mother would serve the best interests of the boys.  The therapist wrote that

Mother was "more stable and has created a positive support system . . . has completed her

case plan and has eliminated the risk factors," and opined the boys were having

behavioral problems because they were not seeing Mother.

But as county counsel pointed out at the August 22 hearing, the therapist had only

seen Mother two times, on August 8 and 12, and had never met the boys or observed any

of Mother's visits with the boys.  Thus, it was reasonable for the court to regard the

therapist's opinions as "[s]elf-serving at best " and "ridiculous," or as utterly lacking

foundation.  In light of the entire record, the therapist's letter, on its face, did not show

changed circumstances.

In a supporting declaration attached to her petition, Mother claimed that by

completing a 12-week parenting class on May 30, 2013, she had "learned new strategies

for correcting problematic behaviors" and had "learned the difference between a messy

home and a dirty home as well as how important sanitation is."  But as minors' counsel

pointed out at the August 22 hearing, Mother *twice* completed the *same* parenting class

before her services were terminated on March 28, 2013.  In this context, Mother's claims

regarding how much she learned from her most recent parenting class, if credited, did not

show changed circumstances.  At most, it was prima facie evidence of *changing*

circumstances.

Mother also argues that the delivered service log, attached to her petition as

exhibit E, constituted *new evidence* that her visits were appropriate, not detrimental,

20

because the delivered service log was not presented to or considered by the court when it suspended visitation on June 5. But the transcript of the June 5 hearing, at which the court suspended visitation, shows the court suspended visitation *not* because Mother was inappropriate during visits, but because the boys would severely act out *following* the visits. A1 would smear his feces and the boys would hit each other. For that reason, the court found visitation was detrimental to the boys. Further, Mother could have, but did not, present the delivered service log to the court for its consideration at the June 5 hearing. Thus, the delivered service log, or the appropriateness of Mother's visits, was not *new evidence* indicating that Mother's visits should have been reinstated or that Mother should have been granted further services.

Additionally, Mother adduced no competent evidence that, if credited, showed she was capable of keeping a safe and sanitary home for the boys, or that she had resolved her long-standing mental health issues. The entire record shows Mother failed to benefit from the services she received through March 28, 2013, when her services were terminated, and nothing in Mother's petition—including the supportive letters from longtime friends and relatives—competently showed that this circumstance had changed by August 22, 2013.

Nor did Mother make a prima facie evidentiary showing that granting her further services or liberalized, extended visitation would serve the best interests of the boys. As discussed, the court suspended visitation on June 5, 2013, because the boys would severely act out following visits. Nothing in the petition, including the August 18, 2013,

21

letter from Mother's therapist, showed the boys would *not* act out if visitation was reinstated. Further, A2 was adjusting well and A1's behavioral problems were improving in their prospective adoptive home. Mother's petition adduced no prima facie showing that the boys' best interests would be served by upending their critically needed stability and giving Mother yet another chance to reunify with them.

In sum, the court did not abuse its discretion in summarily denying Mother's petition without a full evidentiary hearing. The petition adduced no competent evidence that, if credited, supported granting any of the changes Mother was requesting.

B. *Substantial Evidence Supports the Court's Finding That the Boys Were Adoptable*

Father claims insufficient evidence supports the court's finding that the boys were adoptable. Mother joins this claim without additional argument. Again, we find no error.

1. Applicable Law

"The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time." (*In re Jerome D.* (2000) 84 Cal.App.4th 1200 1204; § 366.26, subd. (c)(1).) The focus is on the child, "and whether the child's age, physical condition, and emotional state may make it difficult to find an adoptive family." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 400.) "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's

22

willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649-1650.)

"Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292 [Fourth Dist., Div. Two]; *In re Jerome D., supra,* 84 Cal.App.4th at pp. 1205-1206 [clear and convincing evidence of adoptability requires a finding of ""high probability . . . so clear as to leave no substantial doubt . . . sufficiently strong to comment the unhesitating assent of every reasonable mind. . . ."""].)

On appeal, we review an adoptability finding "only to determine whether there is evidence, contested or uncontested, from which a reasonable court could reach that conclusion." (*In re K.B., supra,* 173 Cal.App.4th at p. 1292.) We do not "reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

2. Analysis

Father argues there was no clear and convincing evidence to support the court's finding that the boys were likely to be adopted within a reasonable time of the August 22, 2013, section 366.26 hearing. He points out that the boys were in two foster homes between October 2012 and June 5, 2013, when they were placed in their prospective adoptive home; A1 exhibited severe behavioral problems in all three homes; and A1's

behavioral problems were ongoing at the time of the August 22 hearing. Father does not seriously argue that A2 was not adoptable.

To be sure, A1's foster placements had been difficult, and he was having difficulty adjusting in his prospective adoptive home. But by August 20, his behavioral problems had improved and were continuing to improve. A1 had not "pooped his pants" for over two weeks, and his enuresis was "reducing in frequency." A1 was also very excited about his activities and attending school, and he was increasingly affectionate toward his prospective adoptive parents.

In addition, Dr. Freier Randall, who evaluated A1 in March 2013, did not believe he had autism, ADHD, or that his behavioral problems were attributable to any medical condition. Rather, his behavioral problems stemmed from his past trauma and would resolve with therapy, a more stimulating and healthy environment, and the consistency and stability a loving home could offer. Indeed, the record unequivocally shows that A1's behavioral problems were much worse before June 5, that is, before parental visitation was suspended and before the boys were placed with their prospective adoptive parents. Finally, neither Bushong, the concurrent planning worker, nor minors' counsel were concerned that the boys would become "legal orphans" or fail to be adopted due to A1's behavioral issues.

Thus here, there is substantial evidence, from which the court could have found by clear and convincing evidence, that the boys would likely be adopted within a reasonable time of the August 22 hearing. The boys were very young, only three and five years old,

and A1's behavioral problems had significantly improved and were continuing to improve. Given A1's young age and Dr. Freier Randall's analysis of the trauma-related causes of his behavioral problems, the court had every reason to believe A1 and A2 would be adopted within a reasonable time of August 22, if not by their prospective adoptive parents, then by another family.

*In re Asia L.* (2003) 107 Cal.App.4th 498 does not assist Father's claim. There, insufficient evidence supported the juvenile court's adoptability finding for children who had severe behavioral problems, because no prospective adoptive home had been identified and the social services agency failed to show there were any approved families willing to adopt children with similar issues. (*Id*. at pp. 510-512.) Here, by contrast, the prospective adoptive parents were still willing to adopt the boys, and even if they ultimately did not adopt the boys, substantial evidence shows the boys were generally adoptable based on their young ages, their lack of serious developmental delays or medical problems, A2's affectionate personality, and the continuing improvements with A1's behavioral problems.

C. *The Court Properly Found the Parental Benefit Exception Did Not Apply*

Both parents claims the court erroneously found that the parental benefit exception to the adoption preference did not apply. (§ 366.26, subd. (c)(1)(B)(i).) Here again, we find no error.

1. The Parental Benefit Exception

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) Permanent plans include adoption, guardianship, and long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.) "Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.)

Adoption involves terminating the legal or parental rights of the child's natural parents. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 574.) In order to avoid termination of parental rights and adoption, a parent has the burden of showing that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply. (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) The exceptions permit the court, "in *exceptional circumstances*," "to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

The parental benefit exception applies when two conditions are shown: the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The relationship must be a *parental* one, not merely a pleasant relationship with a shared, emotional bond. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) And to prove the child would benefit from continuing the parental relationship, the parent must show "either that (1) continuation of the parent-child relationship will promote the well-being of the child to such a degree as

26

to outweigh the well-being the child would gain in a permanent home with new, adoptive parents [citation] or (2) termination of the parental relationship would be detrimental to the child." (*In re Angel B., supra,* 97 Cal.App.4th at p. 466.)

"'The balancing of competing considerations must be performed on a case-by-case basis and take into account many variables, including the age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs. [Citation.]'" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1349-1350.) "If severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1235.)

2. Standard of Review

Appellate courts have traditionally applied either the substantial evidence test or the abuse of discretion test in considering challenges to juvenile court determinations that the parental benefit exception did not apply. (*In re Scott B., supra,* 188 Cal.App.4th at p. 469.) As one court explained: "'[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only "'if [it] find[s] that . . . no judge could reasonably have made the order that he did' . . . .'" [Citations.]" (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.)

27

More recently, courts have applied a composite standard of review, recognizing that the parental benefit exception entails both factual and discretionary determinations. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [substantial evidence standard applies to factual determination whether beneficial relationship exists, and abuse of discretion standard applies to factual determination whether there is a compelling reason to apply the exception]; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [same].)

3. Analysis

The juvenile court found that each parent met the first prong of the parental benefit exception by maintaining regular visitation and contact with the boys. The court also found, however, that the boys would benefit greatly from adoption and would not *at all* from continuing their relationship with the parents. Substantial evidence supports the court's factual finding that no beneficial relationship existed with either parent. And, concomitantly, the court did not abuse its discretion in finding no compelling reason to apply the parental benefit exception.

Indeed, the record is replete with evidence that the boys, and particularly A1, were severely neglected and, as a result, were traumatized while in the parents' care. And after visitation was suspended and the boys were placed in their prospective adoptive home, they no longer asked about the parents. The boys were thriving in their prospective adoptive home, and very much needed the stability and proper care that a permanent, adoptive home would provide. There was no showing that A1 or A2 had a positive,

28

emotional attachment with either parent such that either child would be greatly harmed by severing the parent-child relationship.

## IV.  DISPOSITION

The orders summarily denying Mother's section 388 petition, terminating parental rights, and selecting adoption as the permanent plan for A1 and A2 are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.

We concur:

McKINSTER
      Acting P. J.

MILLER
      J.

29